1   Josh D. Gruenberg, Esq. SB #163281
    Colette N. Mahon, Esq. SB #304745
2   GRUENBERG LAW
    2155 FIRST AVENUE
3   SAN DIEGO, CALIFORNIA 92101
    TELEPHONE: (619) 230-1234
4   TELECOPIER: (619) 230-1074

5   Attorneys for Plaintiff,
    **ERICA BROOKS**

6

7

8                   **UNITED STATES DISTRICT COURT**

9                 **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   ERICA BROOKS, an individual,          Case No. **'20 CV0994 DMS JLB**

12                   Plaintiff,            **PLAINTIFF'S COMPLAINT FOR:**

13           v.                            1. WRONGFUL CONSTRUCTIVE
                                              TERMINATION IN VIOLATION
14   CORECIVIC OF TENNESSEE LLC;              OF PUBLIC POLICY [Cal. Labor
     and DOES 1 through 25, Inclusive,        Code §§ 6400 *et seq.*, 6401 *et*
15                                            *seq.*]];
                                           2. WRONGFUL CONSTRUCTIVE
16                   Defendants.              TERMINATION IN VIOLATION
                                              OF PUBLIC POLICY [Cal. Code
17                                            Regs. Tit. 8, §§ 5141, 3380];
                                           3. WRONGFUL CONSTRUCTIVE
18                                            TERMINATION IN VIOLATION
                                              OF PUBLIC POLICY [29 USC
19                                            654(a)(1)];
20                                         4. WRONGFUL CONSTRUCTIVE
                                              TERMINATION IN VIOLATION
21                                            OF PUBLIC POLICY [29 C.F.R.
                                              §§ 1910.132];
22                                         5. NEGLIGENT SUPERVISION;
23                                         6. INTENTIONAL INFLICTION
                                              OF EMOTIONAL DISTRESS.
24
25                                         **[JURY TRIAL DEMANDED]**
26
27
28

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

COMES NOW THE PLAINTIFF, alleging against Defendants as follows:

**GENERAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

1.    Plaintiff, ERICA BROOKS, (hereinafter "Plaintiff" or "BROOKS"), is a natural person who is, and at all relevant times was, a resident of the United States and a domiciliary of the State of California, County of San Diego.

2.    Plaintiff is informed and believes and thereon alleges that Defendant, CORECIVIC OF TENNESSEE LLC (hereinafter "CORECIVIC") is an unknown business entity doing business in the State of California, County of San Diego with its headquarters and principal place of business in Tennessee.

3.    Pursuant to 28 U.S.C. Section 1391(b)(2), the proper venue for this action is in the Southern District of California, as a substantial part of the events or omissions giving rise to the claims against each defendant occurred in San Diego, California.

4.    The matter in controversy exceeds the sum of $75,000.00.

5.    As a matter in controversy exceeds the sum of $75,000, and the Plaintiff and the Defendants are diverse as set forth in 28 U.S.C. Section 1332(a)(1), this Honorable Court has diversity jurisdiction with respect to this action.

6.    Plaintiff is ignorant to the true names and capacities of the Defendants sued herein as DOES 1 through 25 and therefore sues these defendants by such fictitious names.  Plaintiff will amend this Complaint to allege the true names and capacities when they are ascertained.

7.    Plaintiff is informed and believes and thereon alleges that each fictitiously named Defendant is responsible in some manner for the occurrences herein alleged, and Plaintiff's injuries and damages as herein alleged are directly, proximately and/or legally caused by Defendant.

8.    Plaintiff is informed and believes and thereon alleges that the

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

aforementioned DOES are somehow responsible for the acts alleged herein as the agents, employers, representatives or employees of other named Defendant, and in doing the acts herein alleged were acting within the scope of their agency, employment or representative capacity of said named Defendant.

9. As a further proximate result of Defendants' unlawful and intentional actions, and each of their agents, against Plaintiff as alleged herein, Plaintiff has been harmed in that she suffered emotional pain, mental anguish, loss of enjoyment of life, and emotional distress.

10. Defendants committed these acts alleged herein maliciously, fraudulently, and oppressively, and with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amount to malice or despicable conduct. Alternatively, Defendants' wrongful conduct was carried out with a conscious disregard for Plaintiff's rights.

11. Defendants' conduct warrants the assessment of punitive damages in an amount sufficient to punish Defendants and deter others from engaging in similar conduct.

12. Plaintiff seeks compensatory damages, punitive damages, costs of suit herein, and attorney's fees.

13. Furthermore, Plaintiff alleges that the acts complained of herein took place within the above captioned judicial district.

## SPECIFIC FACTUAL ALLEGATIONS

14. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

**I.   The Parties**

15. Defendant, CORECIVIC, formerly known as Corrections Corporation of America, hired Plaintiff in or around April 2009, in the capacity of Detention Officer at Otay Mesa Detention Center.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

16.  Defendant is a private operator of correctional facilities with contracts for services with U.S. Immigration and Customs Enforcement ("ICE") and U.S. Marshals Service ("USMS").

17.  Otay Mesa Detention Center is a contract detention facility (CDF). It is a privately owned immigration detention center, owned and operated by Defendant and located in San Diego, California.

18.  Otay Mesa Detention Center houses approximately between 1200 to 1300 detainees and inmates.

**II.    Plaintiff's Career with Defendant**

19.  On or about August 7, 2017, Plaintiff began her employment with Defendant at Ocean View, a correctional facility owned and operated by Defendant. While at Ocean View, Plaintiff worked in a variety of positions, including Program Administrative Clerk, Temporary Behaviour Conduct Specialist, and County Site Checker.

20.  On or about August 20, 2018, Plaintiff began in her position as Master Scheduler at Otay Mesa Detention Center. As Master Scheduler, Plaintiff's responsibilities included, but were not limited to, managing the schedule of all approximately 367 Detention Officers, handling their paid time off, training schedules, Family and Medical Leave Act (FMLA) needs, and overtime tracking.

21.  On or about February 3, 2019, Plaintiff accepted the position of Detention Officer at Otay Mesa Detention Center, where she remained throughout the rest of her employment.

22.  As a Detention Officer, Plaintiff worked in a number of different units and posts, including, housing units (also referred to as pods), dining hall (also referred to as the chow hall), medical units, pod recreation post, gymnasium, breaking officer, and visitation.

23.  Throughout Plaintiff's employment at Otay Detention Center, Defendant had

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

a continuous shortage of staff, including both Detention Officers and Supervisors. This made it extremely difficult for Detention Officers to reach a Supervisor when a problem arises. This placed Defendant's Detention Officers in unsafe situations when an issue came up that the Detention Officer could not handle on his or her own.

24.    Throughout Plaintiff's employment, there was also an extensive amount of mandatory overtime. This puts Detention Officers' safety at risk due to significant fatigue. Plaintiff repeatedly notified Defendant about the overtime issues and concerns with significant fatigue.

25.    The high capacity of inmates/detainees that Plaintiff was responsible for in the housing units she was assigned to throughout her employment made it extremely dangerous for Plaintiff and impossible to keep track of all of the inmates/detainees, at times up to 142. While ensuring the safety and security of all inmates/detainees, Plaintiff had numerous other responsibilities, including but not limited to: conducting safety and security checks every thirty minutes, conducting there cell searches per shift, check fire extinguishers, ensure phones and computers in the satellite law library are in good working order, take inventory, send inmates/detainees to the dining hall/medical/visitation/library, and much more.

26.    On many occasions, Plaintiff was assigned to work in the dining hall, which is compromised of the east and west dining halls. This held between approximately 100 to 300 detainees/inmates at once. Many times, there were 300 detainees/inmates at once. Defendant assigns only three Detention Officers to work in each dining hall. On occasions, Plaintiff and only one other Detention Officer was assigned to the dining hall and the only way to remove yourself was by pushing a button by the door and wait for Central Control to open the door.

27.    Defendant does not ensure proper training for its employees. Training in the

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

1  Academy for approximately six weeks prior to working in the facility
2  focuses on self-defense and correctional techniques.  Any on-the-job training
3  for the housing units is only for a couple of days where the Detention
4  Officer shadows the housing unit officer. There is no requirement to
5  demonstrate your competence to work on your own.

6  28.  Plaintiff received a couple of days of on-the-job training for working in the
7  housing units, and approximately forty hours of training for working as a
8  segregation officer. However, there is no other on-the-job training for many
9  of the other units Plaintiff worked, including, but not limited to, the dining
10  hall and working in the corridor to direct traffic of inmate/detainees and
11  other persons. There is also only one day of formal training in the Academy
12  for doing cell extractions, which could be potentially dangerous.

13  29.  Plaintiff also began training new officers within only a few months of her
14  employment. This was a common practice. Detention Officers with very
15  little experience train new officers.

16  30.  Detention Officers are not properly trained on how to work with
17  inmates/detainees with psychiatric issues. On multiple occasions, Detention
18  Officers assist medical personnel with opening doors and helping to transfer
19  psychiatric patients, who many times return to the housing units. On at least
20  one occasion, a Detention Officer was attacked by a psychiatric patient.

21  31.  Defendant does not train Detention Officers on how to handle infectious
22  diseases, yet they are on the front lines of interacting with potentially
23  infected persons. Plaintiff handled a detainee with active tuberculosis and
24  had to ask the medical staff how to do so safely.

25  32.  Detention Officers are also not trained on how to handle biohazards such as
26  feces and blood spills, yet they are responsible for cleaning feces and blood
27  spills. There is a blood spill kit in each pod, but the Detention Officers are
28  not trained on how to use it.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

33.   Inmates/Detainees are responsible for cleaning the facility, yet many are from third world countries and are not trained on how to properly clean. On information and belief, the efficacy of the cleaner is dependent on leaving the cleaner on a surface for ten minutes. Sinks and showers are shared among dozens of detainees/inmates without disinfection between each use. Detainees are not consistently given gloves, even when they are required to clean the unit with used rags. Oftentimes the cleaner runs low in the housing units and the "porters" (cleaning crew) do not have what they need to properly sanitize the housing units.

34.   During the first month of Plaintiff's employment, there was a large shortage of sanitation supplies. There was very little soap or shampoo. Toilet paper was rationed in the housing units. On numerous occasions, Plaintiff broke bars of soap in half to provide to detainees. There were many days were housing units were completely out of soap, shampoo, or toilet paper. There was also a large shortage of paper towels and antibacterial hand sanitizer.

35.   During the week of August 26, 2019, Plaintiff was working in A pod. Many of the females in the housing unit were throwing up and coughing throughout the night. Plaintiff sent several females to the medical unit, but they were returned within approximately ten minutes later and were still throwing up. Plaintiff notified the Unit Manager of A Pod, Rita Ayers ("Ayers") of the conditions, logged the conditions in the log book, reported it to the medical unit, and provided an incident statement to Defendant, specifically Lieutenant Curtis Wilcox ("Wilcox") and Captain Rodwell ("Rodwell"). Throughout the week, Plaintiff repeatedly complained to the shift supervisors, and Unit Manager Ayer, but was told, if medical sent them back then they are fine.

36.   On or about August 29, 2019, Plaintiff reported black mold in a shower in A pod and that its common area had not been mopped in three days because,

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

she was told, no one was assigned to this duty. As of approximately March 10, 2020, Plaintiff still observed the black mold.

37. Instead of addressing Plaintiff's concerns, the very next day Plaintiff was told to write five incident reports on unrelated matters that would possibly implicate herself in a written reprimand.

38. Between approximately September through December 2019, Plaintiff sent multiple emails to Ayers, Paulina Blas ("Blas") (Detention Counselor employed by Defendant and Wilson (Case Manager employed by Defendant) reporting that A pod did not have personal hygiene, specifically feminine products, toilet paper and cleaning products. Plaintiff also logged these concerns in the log book.

39. Specifically, on or about October 4, 2019, Plaintiff reported that female detainees in A pod were told to wipe themselves with paper towels because there were no feminine products or toilet paper.

40. It was the responsibility of the housing unit manager to ensure there were enough supplies. The housing unit managers were aware of the shortages, yet blamed detainees on abusing and hiding toilet paper.

41. The very next day, on or about October 5, 2019, the Unit Manager of A Pod, Ayers, retaliated against Plaintiff by accusing her of making errors in conducting and documenting her law library check and a phone check and directed her to provide incident reports on both. Plaintiff was not posted in A pod on the dates Ayers provided these alleged incidents occurred.

42. Defendant repeatedly placed inmate/detainee and Detention Officers' safety over profits.

43. Defendant retaliated against Plaintiff when she raised concerns about safety throughout her employment.

44. In another example, Plaintiff complained about a co-worker's extreme aggression towards her, yet Defendant never investigated or disciplined the

co-worker despite repeated complaints by Plaintiff. Specifically, on or about November 8, 2018, Plaintiff informed Defendant that Detention Officer Marisela Leyba ("Leyba") aggressively approached her, called her "retarded," put her hand in her face, and screamed at her, regarding changes in the overtime system Plaintiff posted.

45.   In another example, despite multiple incidents of detainees falling off of their top bunks, it was not until a detainee suffered a fatal fall that Defendant installed barriers bolted on the top bunks. Defendant does not act until it is too late.

46.   In another example, Plaintiff questioned the accuracy of her paycheck in or around November 28, 2019. A week later, Defendant selected employees from a list that Plaintiff's name was on to start training to work in Intake, but did not select Plaintiff. Plaintiff spoke to Joe Roemmich ("Roemmich"), Defendant's Chief of Staff at this time, about the process for training. Roemmich said, "your stars have to align." Plaintiff asked, "How do I get my stars to align?" Roemmich replied, "You want to know the process Erica? It's called we pay you $33.83 an hour to do what we tell you too."

47.   The next day, Roemmich told Plaintiff to "be grateful for what you have instead of what you think you deserve."

48.   Defendant's attitude and actions towards its employees confirmed it viewed them as disposable.

**III.   COVID-19 Is A Communicable Disease That Can Cause Serious Illness or Death**

49.   On March 11, 2020, the World Health Organization declared the global outbreak of COVID-19, the disease caused by the novel coronavirus, a pandemic.

50.   It is well established that COVID-19 is easily transmitted, especially in group settings, and that the disease can be extremely serious, causing serious

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

illness and death.

51.   There is no effective treatment or cure yet for the disease and everyone is at risk of infection.

52.   The CDD explained that COVID-19 appears to spread easily and sustainably within communities and is thought to transfer primarily by person-to-person contact through respiratory droplets produced when an infected person coughs or sneezes and may transfer through contact with surfaces or objects contaminated with these droplets. There is also evidence of asymptomatic transmission, in which an individual infected with COVID-19 is capable of spreading the virus to others before exhibiting symptoms.

53.   According to the CDC, older adults and people who are immunocompromised, have severe chronic medical conditions like heart, lung or kidney disease, moderate to severe asthma, severe obesity, diabetes, or other serious underlying medical conditions are also at higher risk for more serious COVID-19 illness. Early data suggested older people are twice as likely to have serious COVID-19 illness.

54.   The CDC has also identified that the data suggests a disproportionate burden of illness and death among racial and ethnic minority groups and among COVID-19 deaths for which race and ethnicity data were available, New York City, identified death rates among Black/African American persons and Hispanic/Latino persons that were substantially higher than that of white or Asian persons.

55.   Individuals who survive may experience permanent loss of respiratory capacity, heart conditions, kidney damage, and other complications.

**III.   Defendant Is At Higher Risk For Transmission Of COVID-19**

56.   California/OSHA identified facilities that house inmates or detainees as being at increased risk for transmission of aerosol transmissible diseases. (CCR, title 8, section 5199). COVID-19, a novel pathogen, is such a disease.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA  92101

57.   At Otay Detention Center, the risk of spread was apparent and has already occurred.

58.   Employees of Otay Detention Center worked in close proximity to one another and inmates and detainees who were maintained in very close quarters.

59.   Taking steps to prevent the COVID-19 from entering and spreading throughout the facility was of the utmost importance in this type of working environment.

**III.   Plaintiff Is At Higher Risk For More Serious Illness From COVID-19**

60.   Plaintiff is an African American female suffering from severe obesity. She lives with her husband who is also at high risk.

**IIII.   Defendant Failed To Take Proper Precautions To Prevent The Spread of COVID-19**

61.   In or around March 2020, COVID-19 cases across the United States and in San Diego County rapidly increased. On March 12, 2020, the CDC reported 1,215 cases with 36 deaths. By March 30, the CDC reported 140,940 cases with 2,405 deaths. Approximately one month later, on April 28, 2020, the CDC reported 981,246 cases with 55,258 deaths. On March 13, 2020, San Diego County reported 5 cases, and by March 23, there were 213 cases and no reported deaths. Approximately one month later, on April 27, 2020, San Diego reported 3,141 cases and 113 deaths.

62.   Even the threat of spread of COVID-19 outside of the detention center was so apparent that many government officials issued "shelter in place" orders and social distancing mandates, which requires persons to stay at least six feet distance apart from each other.

63.   By March 17, 2020, the City and County of San Francisco, along with a group of five other Bay Area counties and the City of Berkeley, issued shelter in place limitations across the Bay Area, requiring everyone to stay

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

1    safe at home except for certain essential needs.

2  64.  Two days later, on March 19, 2020, the State of California issued a state-

3    wide "shelter in place" order requiring people to stay at home except for

4    essential activities and to maintain social distancing to the maximum extent

5    possible.

6  65.  During the weeks leading up to Plaintiff's constructive termination,

7    Defendant was aware of the grave nature of COVID-19 and its rapid

8    transmission.

9  66.  During the weeks leading up to Plaintiff's constructive termination,

10    Defendant was repeatedly advised by numerous sources to take measures to

11    prevent the spread of COVID-19 in its facility.

12  67.  During the weeks leading up to Plaintiff's constructive termination,

13    Defendant failed to adequately respond to the COVID-19 pandemic.

14  68.  On March 12, 2020, Defendant posted on its website, "Consistent with CDC

15    recommendations, personal protective equipment (PPE) such as face masks

16    are allowed to be worn by staff and those in our care within the facility.

17    Disposable gloves are readily available for staff conducting searches and

18    handling property. Staff working at the front lobby screening site wear

19    PPE." This was false.

20  69.  Defendant not provide gloves or masks to its entire staff.

21  70.  Instead, Defendant expressly prohibited Plaintiff and its other employees of

22    Defendant from wearing masks in the housing units and other areas of the

23    facility. Defendant informed its staff of this prohibition in multiple briefings

24    sessions. On information and belief, Defendant informed its staff that if they

25    provided masks to the Detention Officers, then it would scare the

26    inmates/detainees and they would have to provide them to them as well,

27    which would cause them to go over budget. Defendant repeatedly put profits

28    over people.

71.   Throughout Plaintiff's employment, Detention Officers were rarely able to find gloves. Some boxes of gloves were placed in pods, but many times they were not there or too small. Plaintiff had to purchase her own gloves. Even Detention Officers who were responsible for patting down detainees when necessary were also not provided with gloves or masks.

72.   The restrooms used by detainees/inmates and staff, were periodically cleaned by detainees/inmates, as well as the dining hall tables and kitchen. On information and belief, the detainees/inmates did not have proper instruction how to use the cleaner so that it was effective. On information and belief, the efficacy of the cleaner is dependent on leaving the cleaner on a surface for ten minutes.

73.   Defendant also did not provide any cleaning sanitizer or disinfectant wipes to staff, so staff could keep their things and work areas clean. There were sanitizer dispensers in only certain areas of the facility, but throughout Plaintiff's career with Defendant, nearly every time she attempted to use a sanitizer dispenser, it was empty. The only dispenser that Plaintiff encountered that was consistently filled was in the segregation unit.

74.   Each morning, Plaintiff, along with her coworkers, was required to clock in and out through the same device, by placing a finger on the device or punching in times multiple times throughout the day. At the end of the day, Plaintiff and her coworkers were required to answer a series of questions on the device by punching the buttons. The device was never regularly cleaned. Even in the midst of the COVID-19 pandemic, Plaintiff did not observe the device ever being cleaned.

75.   On information and belief, the kiosk machine that Plaintiff and her coworkers were also required to touch in order to obtain and return keys for the different departments they were working in at the start and end of their shifts was also never regularly cleaned. Neither were the keys that were used

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

by different Detention Officers each day.

76. Additionally, upon their arrival to work, Plaintiff, along with many of her coworkers, were required to obtain their equipment, such as a handheld radio, handcuffs, and pepper spray from Central Control. Prior to and during the weeks leading up to Plaintiff's constructive termination, these items were not regularly cleaned. During Plaintiff's employment, she never observed the employee(s) in charge of handing out equipment to other officers wear a glove or mask while carrying out these duties, even in the midst of the COVID-19 pandemic.

77. In addition, on information and belief, the grey bins that staff and visitors place items in, such as shoes, lunch, jackets, purses, and backpacks, and which are placed through a metal detector by either staff or visitors in the main lobby entrance, were not disinfected.

78. On Plaintiff's information and belief, there were never any deep cleanses of the facility, even in the midst of the COVID-19 pandemic.

79. Prior to and during the weeks leading up to Plaintiff's constructive termination, Defendant continued to feed inmates/detainees in the dining hall, which contained approximately two housing units at once, typically approximately 240 persons at once.

80. Throughout the month of March, Defendant also continued to hold and require employees to attend daily briefing sessions. These briefing sessions were held in a break room with approximately thirty to forty people at once.

81. During the briefing sessions, on multiple occasions social distancing and sanitation concerns were brought up by employees.

82. In one briefing session, Plaintiff and other employees asked how social distancing was possible in the facility, specifically, the housing units and in the dining hall, where multiple pods were placed during meal times. The response in effect was "we understand that, but do your job," or words to

that effect. Detention Officers, including Detention Officer Rincon and Officer Cabadas (who works in the kitchen) also brought up the fact that when they hand food trays to detainees, they are face to face, within approximately one foot of each other. Defendant responded that they could absolutely not wear a face mask because it would intimidate detainees because the detainees do not have masks.

83.    Detention Officer Rincon also brought up concerns about the time clock fingerprint readers because everyone touched the time clocks and the employees were concerned. Detention Officer Rincon also suggested hand sanitizer be placed by the time clock. After approximately a week, Defendant finally placed hand sanitizer by the clock.

84.    Throughout the remainder of Plaintiff's employment, Defendant never informed her what cleaning procedures they would implement to prevent COVID-19. Plaintiff never saw anyone wipe down or otherwise disinfect the keys, time clock or central control unit and equipment.

85.    On or about March 18 or 19, 2020, Plaintiff eventually learned through a detainee, that they were directed to clean every hour in their pod. However, detainees use a watered down agent to clean everything, with one part cleaner and three parts water. Defendant, specifically Safety Manager Boyce, informed Plaintiff that the majority is water to prevent suicide in case a detainee drinks it. Between approximately March 11 and 20, 2020, Juilian Terrel (a Case Manager employed by Defendant) told Plaintiff, "hope you feel good about yourself. You're cleaning with water. That stuff is like water," or words to that effect.

86.    In or around March 2020, when Plaintiff logged into her computer, she was presented with basic information, such as washing her hands for twenty seconds, covering her mouth if she coughed, practicing social distancing and staying home if she was sick. Defendant also emailed Plaintiff these

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

recommendations. Defendant did not provide any protocols or directions related to decreasing the risk of transmission in its facility, directions on how to practice social distancing in the facility, or implement any steps to properly disinfect and clean or provide protective gear in response to the COVID-19 pandemic.

87.   Plaintiff never saw or learned how Defendant was ensuring social distancing was even possible. Defendant was filled with so many inmates/detainees that social distancing was not possible and nothing was implemented to attempt social distancing. Most of the housing units were in excess of 100 persons. The bunk beds are no more than four or five feet away from one another. Because of the high volume of detainees/inmates, it is not possible for them to line up six feet apart in order to receive their meals or wait in line as staff move them between different areas of the facility, which includes the Detention Officers who are on guard.

88.   Defendant did not take temperatures of persons before they entered the facility or otherwise triage them to determine if they were experiencing any COVID-19 related symptoms until approximately sometime after mid to late March 2020.

89.   When Defendant did begin taking temperatures, it did so in the enclosed small lobby of the facility. Defendant was readily able to take temperatures outside of the facility to ensure persons with a temperature did not actually enter into the building, increasing the risk of transmission.

90.   It was all too little too late.

91.   In or around the last few days of March 2020, Plaintiff worked in the medical unit. She was watching a detainee who tested positive for tuberculosis. The detainee was not in a negative pressure room or a sealed cell, and a sign was posted to wear a mask only when the "food port was opened." On information and belief, the zero pressure rooms were full.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

Assistant Warden ("Assistant Warden") Roemmich walked by Plaintiff and told her she needed to remove her mask. Plaintiff told AW Roemmich that she was not comfortable removing the mask. AW Roemmich responded, "that's what the sign says," and walked away.

92. On or about March 28, 2020, around 3:00 a.m., AW Roemmich saw Plaintiff in B-pod (a housing unit). In the presence of Unit Manager Natasha Channer and Officer Evelyn Linares, AW Roemmich told Plaintiff, "I have bad news for you Erica." Plaintiff told him, "okay? Am I in trouble? Go ahead," or words to that effect. Roemmich told Plaintiff that wearing masks are prohibited unless a sign is posted and that if she refused to take off her mask, she would be "sent home on your own dime." Plaintiff asked, "how do we protect ourselves?" Roemmich responded, "Look at your ID badge. It's a number, not a name. Everyone's disposable."

93. On or about March 30, 2020, Plaintiff emailed Laura Fuentes ("Fuentes"), Defendant's Human Resources ("HR") Manager. Plaintiff notified Fuentes about her conversation with Roemmich. Plaintiff notified Fuentes about her concerns about prohibiting facemasks and asked for confirmation in writing.

94. On March 30, 2020, ICE Health Service Corps (IHSC) sent a letter to Defendant's staff, including Plaintiff, and ICE leadership. It notified them that on March 29, 2020, three detainees presented to medical with complaints of unspecified lower respiratory illness symptoms. It notified them that IHSC leadership and Core Civic staff made the following recommendations: To implement cohorting (housing together as a group) the unit that housed the three symptomatic detainees and restrict movement for 14 days. There was no way to ensure social distancing. There was only one door in and out of the unit and each room within the units had the capacity to hold eight detainees with bunk beds. The recommendations also permitted exposed detainees to participate in recreational activities and did not require

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

detainees to wear a surgical mask while doing so.

95. The letter provided few additional recommendations. Each falls short of providing Plaintiff and her coworkers with a safe working environment.

96. On or about March 31, 2020, Plaintiff learned an employee tested positive for COVID-19. Plaintiff spoke with Fuentes to discuss her concerns and again asked for a statement in writing that masks were prohibited. Fuentes said that Defendant was following CDC guidelines and not to look at things in a "legal perspective." Plaintiff pushed back explaining that it would be smart for officers to wear mask because they are the ones to leave facility. Fuentes repeated, "right now, the CDC says we don't have to wear masks, so that's what we're doing," or words to that effect. Fuentes denied putting any statement that Plaintiff could not wear a mask in writing multiple times.

97. Plaintiff also asked Fuentes if she was exposed to the Detention Officer who tested positive for COVID-19 who had worked on midshift. Fuentes told Plaintiff she would have been notified.

98. On information and belief, the employee who confirmed positive with COVID-19 had been out of work for 10 days, yet the first mention of this situation by Defendant was 10 days later when they confirmed positive with COVID-19.

99. On April 1, 2020, Plaintiff learned through coworkers that the employee who was infected with COVID-19 had worked on mid-shift (graveyard) in Central Control and had handed out equipment to all of the employees on that shift. This could lead to the infection of each of the employees on that shift and in turn, to others they are in contact with. This was in direct contradiction to what Defendant had led reporters to believe, which was that the detainees/inmates were not exposed to COVID-19 because the infected Detention Officer did not have contact with them in their housing units.

100. Defendant repeatedly failed to protect its employees.

101. Plaintiff repeatedly asked Defendant about the facemasks and never received a response.

102. On or about April 12, 2020, Plaintiff provided her resignation.

103. By creating an unsafe work environment, Defendant essentially terminated Plaintiff's employment.

104. Defendant intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the Plaintiff's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign.

105. Defendant intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the Plaintiff's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign.

106. As of May 29, 2020, there were approximately 234 inmates/detainees and approximately 30 of Defendant's staff who tested positive for COVID-19. This is not to account for the number of family members of Defendant's employees who have also tested positive.

107. Because of the uncontrolled outbreak and transmission of COVID-19 at Defendant's facility, a County of San Diego COVID-19 task force is investigating and trying to help address the situation.

**FIRST CAUSE OF ACTION**

**WRONGFUL CONSTRUCTIVE TERMINATION**

**IN VIOLATION OF PUBLIC POLICY**

**[Cal. Labor Code §§ 6400 *et seq.*, 6401 *et seq.*]**

108. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

109. At all times relevant, Plaintiff was Defendant's employee.

110. California Labor Code §§ 6400 *et seq.* and 6401 *et seq.* were in full force

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

and effect and were binding on Defendant.

111.   California Labor Code § 6407 requires that "[e]very employer and every employee shall comply with occupational safety and health standards, with Section 25910 of the Health and Safety Code, and with all rules, regulations, and orders pursuant to this division which are applicable to his own actions and conduct."

112.   California Labor Code § 6400(a) requires an employer to provide a safe work environment for their employees.

113.   California Labor Code § 6401 requires employers to "furnish and use safety devices and safeguards, and shall adopt and use practices, means, methods, operations, and processes which are reasonably adequate to render such employment and place of employment safe and healthful. Every employer shall do every other thing reasonably necessary to protect the life, safety, and health of the employees."

114.   California Labor Code § 6306 provides that "safety device" and "safeguard" "shall be given a broad interpretation so as to include any practicable method of mitigating or preventing a specific danger."

115.   California Labor Code § 6403 provides that "[n]o employer shall fail or neglect to do any of the following: (a) To provide and use safety devices and safeguards reasonably adequate to render the employment and place of employment safe. (b) To adopt and use methods and processes reasonably adequate to render the employment and place of employment safe. (c) To do every other thing reasonably necessary to protect the life, safety, and health of employees."

116.   California Labor Code § 6404 provides that "[n]o employer shall occupy or maintain any place of employment that is not safe and healthful."

117.   California Labor Code § 6406 provides that "[n]o person shall"

a) Remove, displace, damage, destroy or carry off any safety device, safeguard, notice, or warning, furnished for use in any employment or place of employment.

b) Interfere in any way with the use thereof by any other person.

c) Interfere with the use of any method or process adopted for the protection of any employee, including himself, in such employment, or place of employment.

d) Fail or neglect to do every other thing reasonably necessary to protect the life, safety, and health of employees.

118. Defendant's conduct, as alleged herein, created an unsafe work environment.

119. Plaintiff complained about her safety concerns to Defendant.

120. Defendant intentionally created or knowingly permitted these working conditions.

121. Plaintiff feared for her health and safety.

122. Defendant constructively terminated Plaintiff's employment.

123. Such actions are unlawful, in violation of public policy of the State of California, and have resulted in damage and injury to Plaintiff, as alleged herein.

124. Plaintiff believes and thereon alleges that Defendant's failure to provide a safe work environment was a substantial motivating reason for Defendant's constructive termination of her employment with Defendant.

125. Defendants' constructive termination of Plaintiff's employment on the basis of its failure to provide a safe work environment violated the public policy of the State of California embodied in California Labor Code §§ 6400 *et seq.* and 6401 *et seq.*, in violation of California law pursuant to City of Moorpark v. Sup. Ct. (1998) 18 Cal.4th 1143.

126. As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and Plaintiff has suffered

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

other economic losses in an amount to be determined at time of trial. Plaintiff has sought to mitigate these damages.

127.  As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to her damage in a sum to be established according to proof.

128.  As a result of Defendants' deliberate, outrageous, despicable conduct, Plaintiff is entitled to recover punitive and exemplary damages in an amount commensurate with Defendants' wrongful acts and sufficient to punish and deter future similar reprehensible conduct.

**SECOND CAUSE OF ACTION**

**WRONGFUL CONSTRUCTIVE TERMINATION**

**IN VIOLATION OF PUBLIC POLICY**

**[Cal. Code Regs. Tit. 8, §§ 5141, 3380]**

129.  Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

130.  At all times relevant, Plaintiff was Defendant's employee.

131.  The California Code of Regulations Title 8 of the California Occupational Safety and Health Regulations (Cal/OSHA) was in full force and effect and was binding on Defendant.

132.  Title 8 section 3380 requires employers to conduct a hazard assessment to determine if hazards are present or are likely to be present in the workplace that necessitate the use of Personal Protective Equipment (PPE). If such hazards are present, or likely to be present, the employer is required to select and provide affected employees with properly fitting PPE that would effectively protect employees.

133.  COVID-19 was a hazard that was present, or likely to be present, in Defendant's workplace that necessitated the use of PPE.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

134.   Title 8 section 5141 requires employers to protect employees from harmful exposures (as defined by section 5140, which includes an exposure to fumes, mists, vapors or gases by inhalation that results in or has the probability to result in injury, illness, disease, impairment or loss of function). This provision requires employers to implement engineering controls where feasible and administrative controls where practicable, or provide respiratory protection where engineering and administrative controls cannot protect employees and during emergencies.

135.   COVID-19 was a harmful exposure at Defendant's workplace.

136.   Defendant's conduct, as alleged herein, created an unsafe work environment.

137.   Plaintiff complained about her safety concerns to Defendant.

138.   Defendant intentionally created or knowingly permitted these working conditions.

139.   Plaintiff feared for her health and safety.

140.   Defendant constructively terminated Plaintiff's employment.

141.   Such actions are unlawful, in violation of public policy of the State of California, and have resulted in damage and injury to Plaintiff, as alleged herein.

142.   Plaintiff believes and thereon alleges that Defendant's failure to provide a safe work environment was a substantial motivating reason for Defendant's constructive termination of her employment with Defendant.

143.   Defendants' constructive termination of Plaintiff's employment on the basis of its failure to provide a safe work environment violated the public policy of the State of California embodied in the California Code of Regulations Title 8 of the California Occupational Safety and Health Regulations (Cal/OSHA), in violation of California law pursuant to Green v. Ralee Engineering Co. (1998) 19 Cal.4th 66.

144.   As a direct, foreseeable, and proximate result of Defendants' conduct,

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

Plaintiff has sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and Plaintiff has suffered other economic losses in an amount to be determined at time of trial. Plaintiff has sought to mitigate these damages.

145.  As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to her damage in a sum to be established according to proof.

146.  As a result of Defendants' deliberate, outrageous, despicable conduct, Plaintiff is entitled to recover punitive and exemplary damages in an amount commensurate with Defendants' wrongful acts and sufficient to punish and deter future similar reprehensible conduct.

## THIRD CAUSE OF ACTION
## WRONGFUL CONSTRUCTIVE TERMINATION
## IN VIOLATION OF PUBLIC POLICY
## [29 USC 654(a)(1)]

147.  Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

148.  At all times relevant, Plaintiff was Defendant's employee.

149.  The Federal Occupational Safety and Health Act (OSHA) of 1970 was in full force and effect and was binding on Defendant.

150.  The General Duty Clause, Section 5(a)(1) of the Occupational Safety and Health Act (OSHA) of 1970, 29 USC 654(a)(1), which requires employers to furnish to each worker "employment and a place of employment, which are free from recognized hazards that are causing or are likely to cause death or serious physical harm."

151.  Defendant failed to thoroughly explore all options to comply with OSHA standards.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

152. COVID-19 was a hazard that caused or was likely to cause death or serious physical harm in Defendant's workplace.

153. Defendant's conduct, as alleged herein, created an unsafe work environment.

154. Plaintiff complained about her safety concerns to Defendant.

155. Defendant intentionally created or knowingly permitted these working conditions.

156. Plaintiff feared for her health and safety.

157. Defendant constructively terminated Plaintiff's employment.

158. Such actions are unlawful, in violation of public policy of the State of California, and have resulted in damage and injury to Plaintiff, as alleged herein.

159. Plaintiff believes and thereon alleges that Defendant's failure to provide a safe work environment was a substantial motivating reason for Defendant's constructive termination of her employment with Defendant.

160. Defendants' constructive termination of Plaintiff's employment on the basis of its failure to provide a safe work environment violated the public policy of the United States embodied in the General Duty Clause, Section 5(a)(1) of the Occupational Safety and Health Act (OSHA) of 1970 in violation of California law pursuant to <u>Green v. Ralee Engineering Co.</u> (1998) 19 Cal.4th 66.3.

161. As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and Plaintiff has suffered other economic losses in an amount to be determined at time of trial. Plaintiff has sought to mitigate these damages.

162. As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to her

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

1    damage in a sum to be established according to proof.

2    163.   As a result of Defendants' deliberate, outrageous, despicable conduct,

3    Plaintiff is entitled to recover punitive and exemplary damages in an amount

4    commensurate with Defendants' wrongful acts and sufficient to punish and

5    deter future similar reprehensible conduct.

## FOURTH CAUSE OF ACTION

## WRONGFUL CONSTRUCTIVE TERMINATION

## IN VIOLATION OF PUBLIC POLICY

## [29 C.F.R. § 1910.132]

10   164.   Plaintiff re-alleges and incorporates by reference each and every allegation

11   contained in the preceding paragraphs as though fully set forth herein.

12   165.   At all times relevant, Plaintiff was Defendant's employee.

13   166.   The Code of Federal Regulations Title 29 of the Occupational Safety and

14   Health Standards (OSHA) was in full force and effect and was binding on

15   Defendant.

16   167.   Title 29 section 1910.132 requires employers to conduct a hazard assessment

17   to determine if hazards are present or are likely to be present in the

18   workplace that necessitate the use of Personal Protective Equipment (PPE).

19   If such hazards are present, or likely to be present, the employer is required

20   to select and have each affected employee use PPE that will protect the

21   employee from such hazards, communicate selection decisions and select the

22   PPE that properly fits each affected employee.

23   168.   Title 29 section 1910.132 further requires employers to provide protective

24   equipment, "including personal protective equipment for eyes, face, head

25   and extremities, protective clothing, respiratory devices, and protective

26   shields and barriers", "wherever it is necessary by reason of hazards of

27   processes or environment" "encountered in a manner capable of causing

28   injury or impairment in the function of any part of the body through

absorption, inhalation or physical contact."

169.   COVID-19 was a hazard that was present, or likely to be present, in Defendant's workplace that necessitated the use of PPE.

170.   Defendant's conduct, as alleged herein, created an unsafe work environment.

171.   Plaintiff complained about her safety concerns to Defendant.

172.   Defendant intentionally created or knowingly permitted these working conditions.

173.   Plaintiff feared for her health and safety.

174.   Defendant constructively terminated Plaintiff's employment.

175.   Such actions are unlawful, in violation of public policy of the State of California, and have resulted in damage and injury to Plaintiff, as alleged herein.

176.   Plaintiff believes and thereon alleges that Defendant's failure to provide a safe work environment was a substantial motivating reason for Defendant's constructive termination of her employment with Defendant.

177.   Defendants' constructive termination of Plaintiff's employment on the basis of its failure to provide a safe work environment violated the public policy of the United States embodied in the Code of Federal Regulations Title 29 of the Occupational Safety and Health Standards (OSHA), in violation of California law pursuant to Green v. Ralee Engineering Co. (1998) 19 Cal.4th 66.

178.   As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and Plaintiff has suffered other economic losses in an amount to be determined at time of trial. Plaintiff has sought to mitigate these damages.

179.   As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress,

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

loss of reputation, and mental and physical pain and anguish, all to her

damage in a sum to be established according to proof.

180. As a result of Defendants' deliberate, outrageous, despicable conduct,

Plaintiff is entitled to recover punitive and exemplary damages in an amount

commensurate with Defendants' wrongful acts and sufficient to punish and

deter future similar reprehensible conduct.

### FIFTH CAUSE OF ACTION

### NEGLIGENT SUPERVISION

181. Plaintiff re-alleges and incorporates by reference each and every allegation

contained in the preceding and subsequent paragraphs as though fully set

forth herein.

182. Defendants' supervisory employees failed to provide a safe work

environment in violation of California and federal law.

183. Defendants knew or should have known that this conduct was unlawful and

in violation of California law.

184. Defendant constructively terminated Plaintiff's employment.

185. Such actions are unlawful, in violation of public policy of the State of

California, and have resulted in damage and injury to Plaintiff, as alleged

herein.

186. Plaintiff believes and thereon alleges that Defendant's failure to provide a

safe work environment was a substantial motivating reason for Defendant's

constructive termination of her employment with Defendant.

187. Defendants failed to take steps necessary to prevent the unlawful conduct

described herein.

188. As a direct, foreseeable, and proximate result of Defendants' conduct,

Plaintiff has sustained and continues to sustain substantial losses in earnings,

employment benefits, employment opportunities, and Plaintiff has suffered

other economic losses in an amount to be determined at time of trial.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

1    Plaintiff has sought to mitigate these damages.

2  189.   As a direct, foreseeable, and proximate result of Defendants' conduct,

3        Plaintiff has suffered and continues to suffer humiliation, emotional distress,

4        loss of reputation, and mental and physical pain and anguish, all to her

5        damage in a sum to be established according to proof.

6                        **SIXTH CAUSE OF ACTION**

7              **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

8  190.   Plaintiff re-alleges and incorporates by reference each and every allegation

9        contained in the preceding paragraphs as though fully set forth herein.

10 191.   Defendants' intentional conduct, as set forth herein, was extreme and

11        outrageous.

12 192.   Defendants intended to cause Plaintiff to suffer extreme emotional distress.

13        Plaintiff suffered extreme emotional distress.

14 193.   As a further direct, foreseeable, and proximate result of Defendants'

15        conduct, Plaintiff has sustained and continues to suffer humiliation,

16        emotional distress, loss of reputation, and mental and physical pain and

17        anguish, all to Plaintiff's damage in an amount according to proof at trial.

18 ///

19 ///

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101

**WHEREFORE**, Plaintiff prays for the following relief:

1.    For compensatory damages, including back pay, front pay, and other monetary relief, in an amount according to proof;

2.    For special damages in an amount according to proof;

3.    For mental and emotional distress damages;

4.    For punitive damages in an amount necessary to make an example of and to punish defendants, and to deter future similar misconduct;

5.    For costs of suit, including attorneys' fees as permitted by law, including those permitted by California Code of Civil Procedure section 1021.5;

6.    For an award of interest, including prejudgment interest, at the legal rate as permitted by law;

7.    For injunctive relief;

8.    For such other and further relief as the Court deems proper and just under all the circumstances.

**PLAINTIFF ERICA BROOKS** demands a jury trial on all issues in this case.

DATED: May 29, 2020          **GRUENBERG LAW**

                           __/s Colette Mahon_____

                           JOSH D. GRUENBERG, ESQ.
                           COLETTE N. MAHON, ESQ.
                           Attorneys for Plaintiff,
                           **ERICA BROOKS**

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101