1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

11

ERICA BROOKS,

Case No.:  20cv0994 DMS (JLB)

12

Plaintiff,

13

v.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS**

14

CORECIVIC OF TENNESSEE LLC; and DOES 1 through 25, Inclusive

15

16

Defendants.

17

18

19

20

21

22

23

24

        This case is one of many filed around the country concerning detention facilities and the novel coronavirus.  Many of the cases involve the conditions of confinement for civil and criminal detainees during the COVID-19 pandemic and whether those conditions meet constitutional standards.  The present case arises in the employment context, and asks whether the workplace conditions inside a detention facility were so unsafe and unhealthy that Plaintiff had no reasonable alternative except to resign, resulting in Plaintiff's wrongful constructive termination from her employment.

25

26

27

28

        Pending before the Court is Defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  Plaintiff filed an opposition to the motion, and Defendant filed a reply.  For the reasons discussed below, the motion is granted in part and denied in part.

1

# I.

# BACKGROUND

Plaintiff Erica Brooks is a former employee of Defendant Corecivic, which is a private operator of correctional facilities with contracts for services with United States Immigration and Customs Enforcement and the United States Marshals Service. (Compl. ¶¶15-16.) Plaintiff began her employment with Defendant in August 2017, as a Program Administrative Clerk. (*Id.* ¶19.) She eventually accepted a position as a Detention Officer at the Otay Mesa Detention Center ("OMDC") on February 3, 2019, (*id.* at ¶21), and worked in that capacity until her resignation on April 12, 2020. (*Id.* at ¶102.) "As a Detention Officer, Plaintiff worked in a number of different units and posts, including, housing units (also referred to as pods), dining hall (also referred to as the chow hall), medical units, pod recreation post, gymnasium, breaking officer, and visitation." (*Id.* ¶22.) Around the time Plaintiff resigned, there were approximately 1,000 detainees at OMDC. *Alcantara v. Archambeault,* ___ F.Supp.3d ___, 2020 WL 2315777, at *2 (S.D. Cal. May 1, 2020) (stating there were 987 detainees at OMDC as of April 26, 2020). Plaintiff alleges that during her time as a Detention Officer, OMDC suffered from "a continuous shortage of staff," which often resulted in her overseeing more than 100 detainees at a time. (Compl. ¶¶23-26.)

Many of the events surrounding the COVID-19 pandemic are undisputed and a matter of public record. Plaintiff highlights some of the events in her Complaint, including the rapid spread of the virus in San Diego and across the United States in March 2020 and the "shelter in place" order issued by the Governor of California on March 19, 2020. (*Id.* at ¶¶61-64.) It is undisputed the President of the United States declared a national emergency in light of the pandemic on March 13, 2020. By March 26, 2020, the United States had the most COVID cases in the world. On April 3, 2020, the Centers for Disease Control and Prevention ("CDC") recommended the use of face masks to combat the spread of the virus, representing a reversal of previous guidance that urged people not

/ / /

2

1    to wear masks.[1]  On June 18, 2020, the Governor of California issued an Executive Order

2    mandating face coverings in certain circumstances, including "when working in or

3    walking       through        common        areas"         at          work.

4    https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COV

5    ID-19/Guidance-for-Face-Coverings_06-18-2020.pdf.

6         Plaintiff alleges Defendant "failed to adequately respond to the COVID-19

7    pandemic" at Otay Mesa as these events were unfolding.  (*Id.* ¶67.)  Specifically, she

8    alleges Defendant (1) posted false information on its website concerning the measures it

9    was taking in response to COVID-19, (*id.* ¶68), (2) failed to provide gloves or masks to

10   all staff at Otay Mesa, (*id.* ¶69), (3) prohibited employees at Otay Mesa from wearing

11   masks in certain areas of the facility, (*id.* ¶70), (4) failed to provide necessary cleaning

12   supplies to staff, (*id.* ¶73), (5) failed to clean devices used by all staff, (*id.* ¶¶74-77), (6)

13   failed to properly clean the facility, (*id.* ¶78), and (7) failed to ensure social distancing.

14   (*Id.* ¶87.)  Plaintiff alleges that employees raised these concerns with Defendant during

15   daily briefing sessions, (*id.* ¶80-83), but those concerns were not adequately addressed.

16       Plaintiff alleges that in "the last few days of March 2020," she was assigned to

17   attend to a detainee who had tested positive for tuberculosis.  (*Id.* ¶91.)  She was wearing

18   a mask while doing so, but an Assistant Warden at Otay Mesa told her she needed to

19   remove it.  (*Id.*)  Plaintiff alleges that was not the only time she was ordered to remove

20   her mask.  (*Id.* ¶92.)  Plaintiff alleges she contacted Human Resources ("HR") about these

21   incidents, and expressed her concerns about prohibiting facemasks in the facility.  (*Id.*

22   / / /

23

24   _____

25   [1] It appears that prior to April 3, 2020, the CDC "guidelines stressed that masks should be
     reserved for people who are sick, those taking care of the sick or medical professionals."
26   Terry Spry, Jr., *How US guidance on wearing masks during coronavirus outbreak has
     evolved*,    WUSA9    (Apr.    8,    2020,    updated    12:26    PM    EDT),
27   https://www.wusa9.com/article/news/health/coronavirus/how-us-guidance-on-wearing-
     masks-and-coronavirus-has-evolved/507-43d68b6b-89e8-41b1-868f-90744335e8c7.
28

3

¶93.)  According to Plaintiff, the HR representative told her the facility was following CDC guidelines, which did not require masks.  (*Id.* ¶96.)

Thereafter, Plaintiff learned that one of her co-workers had tested positive for COVID-19.  (*Id.*)  Plaintiff alleges she is at risk of developing severe complications from COVID-19 due to her race (African American) and obesity, and that her husband is also at high risk.  (*Id.* ¶60.)  She alleges Defendant "intentionally created or knowingly permitted working conditions that were so intolerable or aggravated … that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign."  (*Id.* ¶105.)  She alleges that as of May 29, 2020, approximately 234 detainees and 30 staff members had tested positive for the virus at OMDC.  (*Id.* ¶106.)[2] As a result of the "unsafe work environment," Plaintiff alleges she was compelled to resign her position.  (*Id.* ¶¶102-03.)

## II.

## DISCUSSION

Plaintiff alleges claims against Defendant for wrongful constructive termination in violation of public policy, as well as claims for negligent supervision and intentional infliction of emotional distress.  Plaintiff brings her claims to this Court based on diversity jurisdiction, and thus California law applies.  Defendant now moves to dismiss the Complaint.  It argues Plaintiff has not plead facts supporting the elements of wrongful constructive termination or negligent supervision, and that the negligent supervision and intentional infliction claims are barred by workers compensation exclusivity.

/ / /

/ / /

---

[2] In related litigation, the plaintiffs alleged and the defendants did not dispute that in April 2020, OMDC was "home to the largest confirmed COVID-19 outbreak in any federal immigration detention facility in the entire country[.]" *See Alcantara,* 2020 WL 2315777, at *1.

**A.    Legal Standard**

In *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court established a more stringent standard of review for 12(b)(6) motions.  To survive a motion to dismiss under this standard, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).

"Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citing *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007)). In *Iqbal*, the Court began this task "by identifying the allegations in the complaint that are not entitled to the assumption of truth."  *Id.* at 680. It then considered "the factual allegations in respondent's complaint to determine if they plausibly suggest an entitlement to relief." *Id.* at 681.

**B.    Wrongful Constructive Termination**

Plaintiff's first four claims allege wrongful constructive termination in violation of public policy.  Plaintiff contends Defendant constructively discharged her by failing to maintain a safe work environment.  Each of the four claims is predicated on a statute or regulation that requires a safe workplace.  (*See* Compl., First Claim (based on Cal. Labor Code §§ 6400 *et seq.* ("[e]very employer shall furnish … a place of employment that is safe and healthful for the employees therein")); Second Claim (based on Cal. Code Regs. Tit. 8, §§ 5141, 3380 (requiring employers to protect employees from harmful exposures wherever feasible and to provide protective equipment)); Third Claim (based on 29 U.S.C. § 654(a)(1) (Occupational Safety and Health Standards Act) (similar)); and Fourth Claim (based on 29 C.F.R. § 1910.132 (similar to OSHA)).  There is no dispute that the failure to maintain a safe and healthful workplace, if proved, would violate public policy.

5

1   Defendant raises two principal challenges to Plaintiff's constructive discharge
2   claims.  First, Defendant argues Plaintiff fails to state a claim because she does not allege
3   "she was terminated because she engaged in protected activity either by refusing to perform
4   an act that violated public policy or for performing an act that public policy encourages."
5   (Reply Br. at 1.)  Second, Defendant argues Plaintiff has "failed to allege facts that she was
6   subjected to intolerable working conditions."  (*Id.*)  The first of these arguments is
7   misguided, and the second is not properly addressed at the pleadings stage as a matter of
8   law.

9   Defendant accurately points out that a wrongful constructive discharge claim can be
10  based on a situation where an employee, against the employer's demand, refuses to commit
11  an act that violates public policy or performs an act that public policy encourages, *Tameny*
12  *v. Atlantic Richfield Co.,* 27 Cal.3d 167 (1980), but that is not the only type of constructive
13  discharge claim permitted under the law.  In *Rojo v. Kliger,* 52 Cal. 3d 65, 91 (1990), the
14  California Supreme Court stated, "we reject defendant's argument that *Tameny* claims
15  should be limited to situations where, as a condition of employment, the employer 'coerces'
16  an employee to commit an act that violates public policy, or 'restrains' an employee from
17  exercising a fundamental right, privilege, or obligation."  The *Rojo* court further stated,
18  "To the contrary, the cases strongly imply that an action for wrongful discharge will lie, …
19  if the basis for the discharge contravenes a fundamental public policy."  *Id.*  Consistent
20  with *Rojo*, the Judicial Council of California, Civil Jury Instructions ("CACI"), sets out
21  two distinct claims for constructive discharge in violation of public policy, one entitled
22  "Plaintiff Required to Violate Public Policy", CACI 2431, and the other entitled, "Plaintiff
23  Required to Endure Intolerable Conditions That Violate Public Policy".  CACI 2432.  The
24  former addresses a traditional *Tameny* claim, while the latter addresses the claims at issue
25  here—as contemplated by *Rojo*.

26  To prevail on the kind of wrongful constructive discharge claim alleged here,
27  Plaintiff must prove the following:
28  / / /

1.     That [Plaintiff] was employed by [Defendant];

2.     That [Plaintiff] was subjected to working conditions that violated public policy, in that [e.g., Plaintiff was required to work in unsafe or unhealthful conditions without appropriate protective equipment];

3.     That [Defendant] intentionally created or knowingly permitted these working conditions;

4.     That these working conditions were so intolerable that a reasonable person in [Plaintiff's] position would have had no reasonable alternative except to resign;

5.     That [Plaintiff] resigned because of these working conditions;

6.     That [Plaintiff] was harmed; and

7.     That the working conditions were a substantial factor in causing [Plaintiff's] harm.

To be intolerable, the adverse working conditions must be unusually aggravated or involve a continuous pattern of mistreatment.  Trivial acts are insufficient.

CACI 2432.

This CACI instruction relies on *Rojo,* among other cases.  *See* CACI 2432 (Sources and Authority).  Its elements make clear that this type of wrongful constructive discharge occurs when an employee is "subjected to working conditions that violate public policy[,]" (*id.* ¶2), as opposed to a traditional *Tameny* claim, which is predicated on an employer requiring an employee to commit an act that violates public policy or to refrain from exercising a fundamental right, privilege or obligation.  *See* CACI 2431 ¶ 2 (stating employee must prove, "That [the employer] required [the employee] to [e.g., engage in price fixing]").  Plaintiff's claims are framed under CACI 2432, not CACI 2431.

The Court declines Defendant's invitation to limit a wrongful constructive discharge claim to the situations identified by Defendant.  Clearly, *Rojo* provides a path for a wrongful constructive discharge claim based on intolerable workplace conditions.  And the

1  CACI instruction so provides.  Accordingly, Plaintiff may state a constructive discharge
2  claim based on an alleged failure to maintain a safe work environment.

3       Next, Defendant contends Plaintiff has failed to allege facts that she was subjected
4  to intolerable working conditions such that a reasonable person in her position would have
5  no reasonable alternative except to resign.  Whether conditions are so intolerable that they
6  justify an employee's decision to quit is judged by an objective reasonable-employee
7  standard.  *See Turner v. Anheuser-Busch, Inc.,* 7 Cal. 4th 1238, 1247 (1994).  A
8  constructive discharge occurs "when the employer's conduct effectively forces an
9  employee to resign." *Id.* at 1244-45 (stating "[a]lthough the employee may say, 'I quit,'
10  the employment relationship is actually severed involuntarily by the employer's acts,
11  against the employee's will.  As a result, a constructive discharge is legally regarded as a
12  firing rather than a resignation.")  Although "situations may exist where the employee's
13  decision to resign is unreasonable as matter of law, '[w]hether conditions were so
14  intolerable as to justify a reasonable employee's decision to resign is normally a question
15  of fact.'" *Vasquez v. Franklin Management Real Estate Fund, Inc.,* 222 Cal. App. 4th 819,
16  827 (2013) (citation omitted).  Generally, to amount to a constructive discharge, the
17  adverse working conditions "must be unusually 'aggravated' or amount to a 'continuous
18  pattern' before the situation will be deemed intolerable." *Turner,* 7 Cal. 4th at 1247.  The
19  "conditions giving rise to the resignation must be sufficiently extraordinary and egregious
20  to overcome the normal motivation of a competent, diligent, and reasonable employee to
21  remain on the job to earn a livelihood and to serve his or her employer." *Id.* at 1246 (stating,
22  the "proper focus is on whether the resignation was coerced, not whether it was simply one
23  rational option for the employee.")

24       Here, whether the workplace conditions alleged by Plaintiff at the time of her
25  resignation were so intolerable that a reasonable person in Plaintiff's position would have
26  had no reasonable alternative except to resign is inherently fact-bound, particularly
27  considering the circumstances of the case.  Plaintiff alleges she was working in a
28  congregate environment at the height of a novel pandemic that was killing thousands of

8

1   people across the country and spreading rapidly, particularly at OMDC.  She alleges she

2   was medically vulnerable, as was her husband, and that she was unfairly exposed to the

3   virus given her job as a detention officer, the unique physical features of OMDC, and

4   Defendant's failure to act.  Specifically, Plaintiff alleges Defendant was aware of the

5   pandemic and advised by numerous sources to take measures to prevent the spread of virus

6   at the facility.  (Compl. ¶¶65-66.)  Plaintiff alleges Defendant failed to take those measures,

7   (*id.* ¶67), and did "not provide gloves or masks to its entire staff."  (*Id.* ¶69.)  On the

8   contrary, "Defendant expressly prohibited Plaintiff and its other employees … from

9   wearing masks in the housing units and other areas of the facility."  (*Id.* ¶70.)  "Defendant

10   also did not provide any cleaning sanitizer or disinfectant wipes to staff, so staff could keep

11   their things and work areas clean."  (*Id.* ¶73.)  Defendant allegedly failed to disinfect

12   devices and equipment used by all staff, and failed to disinfect the facility, in general.  (*Id.*

13   ¶¶74-76, 78.)  Plaintiff further alleges Defendant failed to ensure social distancing in the

14   facility, (*id.* ¶87), and failed to take people's temperatures before they entered the facility.

15   (*Id.* ¶88.)   According to Plaintiff, Defendant "failed to protect its employees" and

16   "knowingly permitted working conditions that were so intolerable or aggravated at the time

17   of [her] resignation" that a reasonable employee in her position "would be compelled to

18   resign."  (*Id.* ¶¶100, 106.)

19        Given the novelty of the coronavirus at the time of Plaintiff's resignation, scientists

20   and medical professionals were struggling to provide clear guidance on how best to protect

21   against it.  As a result, the guidance provided at local, state and national levels by

22   appropriate medical authorities and political leaders was confusing, if not conflicting, at

23   times, and rapidly evolving.  The CDC, for example, initially recommended not wearing

24   masks, only later to reverse course—while California mandated face coverings in certain

25   circumstances.  *When* various recommendations or directives were implemented by

26   authorities and *how* Defendant responded to them are important factual questions that are

27   bound up in the determination of whether workplace conditions at OMDC on April 12,

28   2020, were so intolerable as to compel a reasonable person in Plaintiff's position to resign.

1  The allegations in the Complaint, taken as true for the purpose of the present motion, could
2  amount to intolerable working conditions such that a reasonable employee would feel
3  compelled to resign.  Accordingly, the Court rejects Defendant's argument that Plaintiff
4  has failed to allege facts sufficient to show a constructive discharge.

5  Defendant also argues that Plaintiff must plead that she "was subjected to differential
6  treatment." (Mot. at 7.)  In support of its argument that differential treatment is an element
7  of constructive discharge, Defendant cites *Turner* and *Watson v. Nationwide Ins. Co.*, 823
8  F.2d 360, 361 (9th Cir. 1987).  *Turner* includes dicta suggesting that differential treatment
9  is an element of constructive discharge.  7 Cal. 4th at 1247 (quoting *Goldsmith v. Mayor*
10 *and City of Baltimore*, 987 F.2d 1064, 1072 (4th Cir. 1993)) ("'An employee is protected
11 from … unreasonably harsh conditions, in excess of those faced by his [or her] co-
12 workers.'")  However, that language did not make it into the court's ultimate formulation
13 of the elements of constructive discharge, where the court held:

14
15     In order to establish a constructive discharge, an employee must plead and
       prove … that the employer either intentionally created or knowingly permitted
       working conditions that were so intolerable or aggravated at the time of the
16     employee's resignation that a reasonable employer would realize that a
       reasonable person in the employee's position would be compelled to resign.
17

18 *Turner,* 7 Cal. 4th at 1251.  No requirement of differential treatment is set out in *Turner* or
19 in any other authority cited by Defendant.  Plaintiff correctly argues that while differential
20 treatment "may be one way to establish constructive discharge, it is not required." (Opp'n
21 at 16.)  *Watson* is also unhelpful to Defendant as it involved a claim for employment
22 discrimination, which necessarily involves differential treatment.  823 F.2d at 361.
23 Notably, too, the CACI instruction contains no such element.  Accordingly, Defendant has
24 not shown that differential treatment is an element of constructive discharge.  Assuming
25 the facts alleged in the Complaint are true, as the Court must at this stage of the
26 proceedings, Defendant's motion to dismiss Plaintiff's constructive discharge claims is
27 denied.
28 *///*

**C.      Workers' Compensation Exclusivity**

Next, Defendant argues Plaintiff's negligent supervision and intentional infliction of emotional distress claims must be dismissed because they are barred by workers' compensation exclusivity.  "Subject to limited exceptions, workers' compensation is the only remedy available to injured employees against an employer responsible for injuries 'arising out of and in the course of employment.'"  *Stiefel v. Bechtel Corp.*, 497 F.Supp.2d 1138, 1152 (S.D. Cal. 2007).

> An injury is compensable for exclusivity purposes if two conditions exist, the plaintiff is seeking to recover for an 'industrial personal injury or death' sustained in and 'arising out of and in the course and scope of employment,' and the acts or motives giving rise to the injury constitute 'a risk reasonably encompassed within the compensation bargain.'

*Id.* (quoting *Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund*, 24 Cal. 4th 800, 813-14, 819-20 (2001)).

Here, Defendant argues Plaintiff's claims for negligent supervision and intentional infliction of emotional distress fall within the compensation bargain, and thus these claims are barred by workers' compensation exclusivity.  Numerous courts agree with Defendant. *See Miklosy v. Regents of Univ. of Calif.*, 44 Cal. 4th 876 (2008) (finding claim for intentional infliction of emotional distress barred by workers' compensation exclusivity); *Erhart v. BofI Holding, Inc.*, 269 F.Supp.3d 1059, 1080-83 (S.D. Cal. 2017); *Webb v. County of Trinity*, 734 F.Supp.2d 1018,  1034-35 (E.D. Cal. 2010) (same); *Stiefel*, 497 F.Supp.2d at 1153 (concluding plaintiff's negligent supervision claim was subject to workers' compensation exclusivity provisions); *Norwood v. Leland Stanford Junior Univ.*, No. C-03-02424 RMW, 2004 WL 2203553, at *8 (N.D. Cal. Sept. 29, 2004) (stating negligent supervision claim "is barred by the workers' compensation exclusivity laws."); *Bragg v. E. Bay Reg'l Park Dist.*, No. C-02-3585-PJH, 2003 WL 23119278, at *7 (N.D. Cal. Dec. 29, 2003) (citing *Vuillemainroy v. American Rock & Asphalt, Inc.*, 70 Cal.App.4th 1280, 1282, 83 Cal.Rptr.2d 269 (1999)) ("When [a claim for negligent supervision] is asserted by one employee against her co-workers and her employer, it is

barred by the worker's compensation exclusivity doctrine."); *Haynal v. Target Stores*, No. 96-1599-K(RBB), 1996 WL 806706, at \*6 (S.D. Cal. Dec. 19, 1996) (stating Workers' Compensation Act "prohibits all negligence claims, including negligent supervision claims, that arise in the course of employment.").

Nevertheless, Plaintiff attempts to avoid this conclusion by arguing that her negligent supervision and intentional infliction of emotional distress claims are based on conduct that "contravenes fundamental public policy" and "exceeded the risk inherent in the employment relationship." (Mot. at 18, 23.)  However, both of these arguments miss the mark.

In cases involving claims for negligent supervision, courts tend to focus not on whether the claim is based on conduct that is offensive to public policy but on the broader question of whether the conduct is part of the compensation bargain.  Negligent supervision claims based on harassment or discrimination have been found to fall outside the workers' compensation system, not because they are based on conduct that is contrary to public policy (although they are), but because harassment and discrimination do not fall within the compensation bargain.  *See*, *e.g.*, *Tipton v. Airport Terminal Servs., Inc.*, No. 218CV09503ABJEMX, 2019 WL 3035095, at \*1 (C.D. Cal. Apr. 16, 2019) (addressing negligent supervision claim based on disability discrimination); *Lurie v. Konica Minolta Bus. Sols. U.S.A., Inc.*, No. CV1600787RGKGJS, 2016 WL 7508183, at \*1 (C.D. Cal. Mar. 14, 2016) (addressing discrimination claim); *Jefferson v. Kellogg Sales Co.*, No. C 08-04132 SI, 2008 WL 4862511, at \*1 (N.D. Cal. Nov. 11, 2008) (addressing negligent supervision claim based on racial discrimination); *Ihama v. Bayer Corp.*, No. C 05-03483 WHA, 2005 WL 3096089, at \*2-3 (N.D. Cal. Nov. 14, 2005) (addressing negligent supervision claim based on discrimination); *Greenfield v. Am. W. Airlines, Inc.*, No. C03-05183 MHP, 2004 WL 2600135, at \*1 (N.D. Cal. Nov. 16, 2004) (addressing negligent supervision claim based on sexual harassment).

Here, Plaintiff argues her negligent supervision and intentional infliction of emotional distress claims fall outside the compensation bargain because they involve a

12

1   response to a pandemic, which "was never contemplated as a risk inherent in the

2   employment relationship." (Mot. at 20.)  But the Court disagrees with this argument.

3   Although pandemics themselves are generally uncommon events, that does not mean

4   Defendant's response to the pandemic falls outside the risk inherent in the employment

5   relationship.  On the contrary, one would expect employers to have some type of protocol

6   in place to deal with this kind of catastrophic event.  This is especially so considering

7   Defendant is engaged in the operation and management of detention facilities, which are

8   particularly susceptible to the spread of infectious diseases, such as COVID-19.  *See*

9   *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in*

10  *Correctional        and        Detention        Facilities*        (July        22,        2020),

11  https://www.cdc.gov/coronavirus/2019-ncov/community/correction-  detention/guidance-

12  correctional-detention.html (stating congregate environments have heightened potential

13  "for SARS-CoV-2 to spread once introduced.")  Furthermore, Plaintiff's claims are

14  essentially based on Defendant's failure to maintain a safe and healthy workplace.  (*Id.* at

15  8-9) ("Defendant's actions created an unsafe work environment because it did not

16  adequately respond to the COVID-19 pandemic in an attempt to prevent transmission.")

17  That obligation exists at all times, and does not fall outside the compensation bargain just

18  because the triggering event is a pandemic.  Because the obligation to provide a safe and

19  healthy workplace is inextricably part of the compensation bargain, Plaintiff's negligent

20  supervision and intentional infliction of emotional distress claims are barred by workers'

21  compensation exclusivity.  Accordingly, the Court grants the motion to dismiss these

22  claims.

### III.

### CONCLUSION AND ORDER

25      For the reasons set out above, the Court grants in part and denies in part

26  Defendant's motion to dismiss.  Specifically, the Court grants the motion as to Plaintiff's

27  claims for negligent supervision and intentional infliction of emotional distress, and

28  denies the motion as to Plaintiff's wrongful constructive termination claims.     In

20cv0994 DMS (JLB)

1   accordance with Plaintiff's request, Plaintiff is granted leave to file a First Amended

2   Complaint that cures the pleading deficiencies set out in this Order.[3]   Plaintiff is cautioned

3   that if her First Amended Complaint does not cure these deficiencies, the claims at issue

4   will be dismissed with prejudice and without leave to amend.   The First Amended

5   Complaint shall be filed on or before **September 18, 2020**.

6          **IT IS SO ORDERED**.

7   Dated:  September 4, 2020

8                                                                  Hon. Dana M. Sabraw

9                                                                  United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   [3]  In addition to the deficiencies set out above, the Court notes it agrees with Defendant that
     Plaintiff has failed to set forth sufficient facts to support her negligent supervision claim.
26   For instance, Plaintiff has failed to identify the employee or employees Defendant
     negligently supervised.  *See* CACI 426 (setting out elements of claim for negligent
27   supervision).  Thus, if Plaintiff chooses to amend her negligent supervision claim, she must
     also cure these pleading deficiencies.
28